Carol COLLINS, Appellant,

v.

Harry A. JOHNSON, Respondent.

No. C5–85–384.

Court of Appeals of Minnesota.

Sept. 24, 1985.

Review Denied Nov. 26, 1985.

Thomas W. Wexler, Minneapolis, for appellant.

Robert M. Frazee, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, for respondent.

Heard, considered, and decided by PARKER, P.J., and HUSPENI and FORSBERG, JJ.

## OPINION

HUSPENI, Judge.

This is a medical malpractice action. Appellant Carol Collins appeals the trial court's dismissal of the action at the conclusion of Collins' presentation of her case. The trial court dismissed the case pursuant to the statute of limitations, Minn.Stat. § 541.07 (1976), and Minn.R.Civ.P. 41.02(2). We affirm.

## FACTS

Dr. Harry A. Johnson, a specialist in plastic and reconstructive surgery, performed an abdominal panniculectomy on Collins on February 14, 1977. This is a surgical procedure to remove loose abdominal skin and it is commonly referred to as a "tummy tuck." Collins' complaint alleges:

> That the operation performed by defendant was negligently and carelessly performed; that defendant negligently failed to fully advise plaintiff with re-

spect to the nature of the surgery to be performed, the results to be expected, and the risks of the surgery; and that defendant committed other acts of negligence which caused or contributed to the unsatisfactory results of the surgery.

The case came to trial before a jury on May 16, 1984. By the time of trial, Collins no longer claimed that the surgical procedure had been negligently performed. Her only claim of malpractice was that Johnson failed to sufficiently advise her regarding the surgery and its natural results.

In the past Collins has been employed as a model for television commercials, ramp modeling and liquor promotions. She first saw Johnson on June 29, 1976. At that time she was 26 years old, married and had two children. Collins and her husband subsequently separated in April 1978. She had multiple stretch marks and considerable loose skin on her abdomen. As an infant, she had two surgeries for bowel obstruction which resulted in a five-inch, vertical scar on the right side of her abdomen.

During her first visit with Johnson, Collins asked him if he could alleviate her stretch marks. Johnson suggested that an abdominal panniculectomy (tummy tuck) was the appropriate procedure. Collins testified that Johnson drew her a diagram, briefly explained the procedure, and told her that a previous patient of his recently vacationed in Florida and was able to wear a bikini without a scar visible to the public. Collins further testified that Johnson indicated to her that the surgical scar would be located in the pubic region and would not be noticeable. Finally, Collins testified that Johnson told her he would remove the previous abdominal scar, but that he could not remove all the stretch marks. Johnson also recommended that Collins lose some weight before the surgery was performed.

Collins asserts that Johnson did not discuss with her any risks or complications associated with the surgical process such as potential infection, the potential danger of a hematoma, the possibility of numbness, or permanent residual pain in the abdominal area. In addition, Collins asserts that Johnson did not inform her that the surgical procedure would undermine the abdominal skin up to her rib cage and affect the appearance of her navel.

Johnson testified at trial that he could not remember much about the initial consultation. He did recall that he drew a diagram of the location of the proposed surgery on the back of the surgical consent form before Collins signed the form. Johnson's deposition testimony indicates that it is his practice to inform a surgical candidate about the complications of surgery, (i.e., infection, hematoma, or wound separation) before the candidate signs a surgical consent form. Johnson testified at his deposition that he advised Collins regarding the complications of the surgery and he told her that her stretch marks would not be completely removed, that her navel would be at a new site, that a part of her previous scar would remain, that the surgical area would be numb for a "period of time," and that the area would need to heal for twelve to eighteen months before Collins could engage in active physical exercise.

Seven months after the initial consultation, Collins called Johnson and told him that she had lost twenty pounds, the weight loss Johnson had recommended.

The surgery was performed on February 14, 1977. Johnson did not see Collins until a few minutes before the surgery, after anesthesia had already been administered to her. Johnson testified that he indicated to Collins where he was going to make the incision and he asked her if she had any questions about the surgery. They had no discussion.

Collins testified that she expected a simple operation. Instead, after the surgery she was required to lie in a special position with tubes in her stomach, a bandage over the incision, and a cast-like weight over the bandage. She testified that she was very uncomfortable and experienced great pain. Collins further testified that Johnson told her the day after the surgery that he "got rid" of all her stretch marks and that the previous scar was gone. Johnson was not

questioned at trial about statements he made to Collins at that time. Nurses' notes of February 16 indicate that Collins complained that she was poorly informed prior to surgery. Collins was discharged from the hospital on February 17 with instructions to continue to wear a special girdle, stay in bed, and keep the cast on her stomach. Collins testified that she followed these recommendations at home as long as Johnson indicated it was necessary.

Collins had her first follow-up exam one week after her discharge from the hospital. Johnson testified that his office notes indicate that the wound was healing well. Collins testified, however, that there was "extreme swelling" on the right side of her rib cage, and that Johnson withdrew some of the fluid and told her that the remainder would be absorbed by her body tissue over a period of time.

Her second post-operative visit occurred one week later. Johnson's office notes indicated that a few sutures were removed and that the wound was healing well. Collins was now allowed to take baths and change the surgical bandages.

Collins testified that, after this visit, she saw her abdomen for the first time. She testified that the surgical scar was higher and wider than she anticipated, her stretch marks were still there, and "something had been done" to her navel.

On March 11, 1977, Collins returned to Johnson for a third post-operative visit. At that time, she discussed with him her concerns about the location of the incision and the continued swelling of her abdomen, and she complained that the front of her torso beginning under her breasts and extending to the top of her legs was numb. Collins testified that Johnson told her not to worry, that the scar was swollen from surgery, that it would fade as it healed and be less noticeable, and that the numbness would get better. Regarding this visit, Johnson's testimony merely indicates that the remaining sutures were removed and that the wound was healing well.

On April 15, 1977, Collins returned for her fourth post-operative visit. Collins testified that Johnson told her that the incision was healing nicely and that she should return in three months. Collins was also instructed to massage the wound area with Nivea cream to facilitate the healing process.

Collins experienced problems with the incision not healing in one area. Johnson prescribed antibiotics for Collins over the phone on June 8, 1977. Collins took the medication as prescribed and the incision healed without further infection.

Collins did not see or talk with Johnson again on a doctor/patient basis. This action was commenced June 4, 1979.

At trial, Collins testified that she has sensations of pain and numbness in her abdominal area, that her stomach is extremely sensitive, that she cannot sleep or tolerate shower spray on her stomach, and that she cannot engage in sexual relations that require contact with her stomach. She also testified that the pain affects her interaction with her children, and that she has had no sexual relations with her husband since the surgery. Furthermore, Collins testified that she has an ugly prominent scar located higher on her abdomen than where Johnson told her it would be.

Dr. Chesler, Collins' expert witness, testified that the altered sensation in the skin of the abdominal wall was a natural result of the surgery. His testimony indicates that during the surgery small nerves in the abdominal area must be cut and that it takes one to two years for the nerves to regenerate. Occasionally the nerves do not completely regenerate. His testimony also indicates that complaints of pain and numbness are not inconsistent. The scar is thirteen inches long and, in some portions, it is one-half to three-quarters of an inch wide. Chesler testified that the width of the scar may have been affected by Collins' activities subsequent to surgery.

The record indicates that Johnson charges one lump sum, payable before surgery, for a "tummy tuck." This lump sum includes the initial consultation, surgery, hospitalization, and all post-operative care.

The majority of Johnson's patients return for follow-up care for a year following their surgery. Johnson testified that Collins was negligent because she did not return for the full course of post-operative care.

After Collins finished submitting her case, the trial court granted Johnson's motion for dismissal pursuant to Minn.R. Civ.P. 41.02(2) and the applicable statute of limitations, Minn.Stat. § 541.07. The trial court dismissed Collins' action on the basis that Collins had failed to comply with the two-year statute of limitations in section 541.07. The trial court's rationale was that Collins' claim is restricted to a single act of alleged negligence, since her claim is Johnson's failure to disclose the risks of surgery, particularly the possibility of numbness in the abdomen and the location of the scar. The trial court determined that Collins was aware of the numbness and the scar at the very latest on April 15, 1977. The trial court further concluded that she did not have a valid claim of fraudulent concealment which would have tolled the statute of limitations.

### ISSUES

1. Did the trial court err in determining that appellant's cause of action is based on a single act, rather than a course of treatment?

2. Did the trial court err in determining that the statute of limitations was not tolled on the basis of fraudulent concealment?

3. Does the statute of limitations in medical malpractice actions begin running upon a plaintiff's discovery of the injury?

### ANALYSIS

#### I.

An action for medical malpractice is barred if it is not commenced within two years of the date on which the cause of action accrues. Minn.Stat. § 541.07(1). The legislature has not defined when a cause of action pursuant to section 541.07 accrues. Consequently, through case law,

our state supreme court has developed a flexible interpretation of the term. In *Swang v. Hauser*, 288 Minn. 306, 180 N.W.2d 187 (1970), the supreme court stated:

> The 2-year statute of limitations for medical malpractice ordinarily does not commence to run until the termination of the treatment for which the physician is retained. A practical reason for this general rule is that the actionable treatment does not ordinarily consist of a single act or, even if it does, it is most difficult to determine the precise time of its occurrence. A policy reason is that the patient must repose reliance upon his physician in the completion of the course of curative treatment, a relationship of trust which inhibits the patient's ability to discover acts of omission or commission constituting malpractice. The physician must accordingly assume a most substantial burden to establish with certainty that his patient actually knew, or should have known, of the malpractice prior to the end of the treatment.

*Id.* at 309, 180 N.W.2d at 189–90 (citations omitted).

This general rule does not apply when the actionable treatment is a single act. In *Togstad v. Vesely, Otto, Miller & Keefe*, 291 N.W.2d 686 (Minn.1980), the supreme court explained:

> [W]here the injury complained of consists of a "single act," the limitations period commences from the time of that act, even though the doctor-patient relationship may continue thereafter.

*Id.* at 694.

Collins argues that the general "continuing treatment" rule should determine when this cause of action accrued. She cites the fact that she paid a lump sum for the surgery and all subsequent care. She contends that her treatment continued until June 8, 1977, the date of her phone consultation with Johnson and the last date that she had any contact with Johnson as her physician. She maintains that at that point she was still under Johnson's influence and

was willing to abide by his recommendations. Like the trial court, we reject this argument.

Collins' claim is restricted to a single act of malpractice: Johnson's failure to sufficiently advise her regarding the surgical procedure and its natural consequences and risks. All of Collins' complaints—the loss of sensation due to undermining of the abdominal skin, the size and placement of the scar, and the alteration of the skin surrounding the umbilicus—were fixed and unalterable after the surgery was performed. Collins' expert, Dr. Chesler, testified that these conditions were the natural result of the surgical procedure and no amount of subsequent treatment could alter or cure them.

■ The trial court properly rejected Collins' attempt to categorize her June 8, 1977 phone call as part of a continuing course of treatment. The trial court correctly determined that Collins was aware of the conditions about which she claims she was misinformed at the very latest April 15, 1977, the date of her last visit to Johnson.

## II.

■ In response to the statute of limitations defense raised by Johnson, Collins alleges that Johnson fraudulently concealed her cause of action against him. The rule tolling the statute of limitations when there is fraudulent concealment of a cause of action is set forth in *Schmucking v. Mayo*, 183 Minn. 37, 235 N.W. 633 (1931):

> [W]hen a party against whom a cause of action exists in favor of another, by fraudulent concealment prevents such other from obtaining knowledge thereof, the statute of limitations will commence to run only from the time the cause of action is discovered or might have been discovered by exercise of diligence.

*Id.* at 38–39, 235 N.W. at 633.

■ "There is no categorical definition of what constitutes fraudulent concealment." *Wild v. Rarig*, 302 Minn. 419, 451, 234 N.W.2d 775, 795 (1975), *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). The party claiming fraudulent concealment has the burden of showing that the concealment could not have been discovered sooner by reasonable diligence on her part and was not the result of her own negligence. *Id.* at 450–51, 234 N.W.2d at 795. In addition, we stress that the concealment must be fraudulent or intentional. *See id.* at 451, 234 N.W.2d at 795 (quoting 54 C.J.S. *Limitations of Actions* § 206f (1948)).

■ In considering Johnson's motion to dismiss, the trial court had to determine whether the evidence, viewed in the light most favorable to Collins, was sufficient to present a fact question for the jury on the issue of whether Johnson fraudulently concealed Collins' cause of action against him. *See Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn.1980). A motion to dismiss in a jury case should be granted in those unequivocal cases where, in light of evidence as a whole, it would clearly be the duty of the trial court to set aside a contrary verdict as manifestly against the evidence or where it would be contrary to the law applicable to the case. *Snortland v. Olsonawski*, 307 Minn. 116, 119, 238 N.W.2d 215, 217 (1976).

■ The trial court determined that the evidence was insufficient to present a jury question on the issue of fraudulent concealment. After our careful examination of the record, we agree with the trial court.

First, there is no evidence which would support a jury finding that Johnson fraudulently concealed Collins' cause of action against him. There is evidence that during Collins' four post-operative visits, Johnson reassured her that her incision was healing well, that the numbness and swelling would subside, and that she should not worry. He also advised her about massage and the use of Nivea cream. No evidence was presented, however, from which the jury could have concluded that Johnson knew that his representations about the surgery were false or that he made such representations in reckless disregard of their truth or falsity. *See Murray v. Fox,*

300 Minn. 373, 379, 220 N.W.2d 356, 360 (1974).

Second, we do not believe that Collins met her burden of showing that she could not have discovered Johnson's alleged concealment sooner by exercising reasonable diligence. Nurses' notes following surgery show Collins may have thought as early as February 16, 1977 that she was misinformed about the surgery. She was cognizant at least by the beginning of March 1977 of the scar's appearance, the numbness and the swelling, and her navel's location. Collins was not prevented from discovering facts upon which her alleged cause of action might rest. The evidence clearly establishes that she was aware of the facts giving rise to her claim at the latest on April 15, 1977, more than two years before the commencement of her action against Johnson. *See Swang v. Hauser*, 288 Minn. 306, 309, 180 N.W.2d 187, 190 (1970).

The trial court properly determined that the "fraudulent concealment" exception to the statute of limitations was not applicable to Collins' claim.

### III.

 Finally, Collins urges this court to save her case from dismissal by applying the rule that the statute of limitations begins to run only when a person discovers his or her injury. Other jurisdictions have adopted this rule. *See, e.g., Sandbulte v. Farm Bureau Mutual Insurance Co.*, 343 N.W.2d 457, 462 (Iowa 1984); *Sacchi v. Blodig*, 215 Neb. 817, 341 N.W.2d 326, 329 (1983); *Anderson v. Shook*, 333 N.W.2d 708, 712 (N.D.1983). However, our supreme court has declined to do so. In *Johnson v. Winthrop Laboratories Division of Sterling Drug*, 291 Minn. 145, 190 N.W.2d 77 (1971), the court observed:

> Courts have no power to extend or modify statutory limitation periods. Chapter 541 itself sets forth specific conduct or circumstances which will toll the running of the limitation periods. The legislature has not seen fit to provide a statutory tolling period to protect plaintiffs from their own ignorance although we held many years ago that such ignorance does not toll statutes of limitations.

*Id.* at 151, 190 N.W.2d at 81 (citations omitted). *See also Wild v. Rarig*, 302 Minn. at 450 n. 21, 234 N.W.2d at 794–95 n. 21.

Any modification of the statutory limitation period must come from the legislature.

### DECISION

The trial court did not err when it dismissed appellant's action pursuant to Minn. Stat. § 541.07. It did not err in determining that appellant's cause of action is based on a single act of which she was aware prior to April 15, 1977 and that the statute of limitations was not tolled on the basis of fraudulent concealment. Minnesota does not recognize the rule that the statute of limitations in medical malpractice actions begins to run only upon the discovery of the injury.

Affirmed.